Dirk O. Julander, Bar No. 132313
  *doj@jbblaw.com*
Catherine A. Close, Bar No. 198549
  *cac@jbblaw.com*
JULANDER, BROWN & BOLLARD
9110 Irvine Center Drive
Irvine, California 92618
Telephone:  (949) 477-2100
Facsimile:  (949) 477-6355

*Attorneys for Plaintiff ATLANTIC-*
*PACIFIC PROCESSING SYSTEMS, INC.*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ATLANTIC-PACIFIC PROCESSING SYSTEMS, INC., a Nevada corporation, | Case No. |
| | **COMPLAINT FOR:** |
| Plaintiff, | |
| vs. | 1. Breach of Contract Against Hotel Quickly; |
| | 2. Breach of Guaranty Against Merryman; |
| RISING SUN USA INC. a.k.a. HOTEL QUICKLY INC., a Delaware corporation; DOUG E. MERRYMAN, an individual; and JÉRÔME CLÉ, an individual, | 3. Fraud Against Merryman; |
| | 4. Violation of 18 U.S.C. § 1962(c) Against All Defendants; |
| | 5. Contractual Indemnification Against Merryman and HQ Inc.; and |
| Defendants. | 6. Equitable Indemnification Against all Defendants |
| | **(DEMAND FOR JURY TRIAL)** |

Plaintiff, ATLANTIC-PACIFIC PROCESSING SYSTEMS, INC., a Nevada

Corporation (hereinafter "Plaintiff" or "APPS") hereby alleges for its Complaint

against Defendants RISING SUN USA INC. a.k.a. HOTEL QUICKLY INC.,

DOUG E. MERRYMAN, and JÉRÔME CLÉ as follows:

COMPLAINT

**PARTIES**

1.      Plaintiff is, and at all relevant times was, a corporation duly organized and existing under and by virtue of the laws of the State of Nevada with its registered office in Clark County, Nevada.

2.      Plaintiff is informed and believes and, based thereon, alleges that Defendant RISING SUN USA INC. a.k.a. HOTEL QUICKLY INC. ("HQ Inc.") is, and at all relevant times was, a corporation duly organized and existing under and by virtue of the laws of the State of Delaware, with a registered office in Wilmington, Delaware and its principal place of business in Pleasanton, California. HQ Inc. owns and operates a hotel booking website, taking online hotel reservations from customers in this district and throughout the United States.

3.      Plaintiff is informed and believes, and based thereon, alleges that Defendant DOUG E. MERRYMAN ("Merryman") is an individual residing in Pleasanton, California.  Merryman is listed as the sole owner, officer and director of HQ Inc., though the company was controlled by Defendant JÉRÔME CLÉ.

4.      Plaintiff is informed and believes, and based thereon, alleges that Defendant JÉRÔME CLÉ ("Clé") is an individual residing in Pleasanton, California. Clé is the sole director and CEO of HotelQuickly Ltd., a private business entity organized in Asia, and is a *defacto* owner/officer of HQ Inc.

5.      Hereafter, Merryman and Clé will sometimes be referred to collectively as the "Individual Defendants."  All Defendants will also sometimes be collectively referred to as the "Defendants."

6.      Plaintiff is informed and believes, and based thereon alleges, that there exists, and at all relevant times there existed, a unity of interest and ownership between and among the Individual Defendants and HQ Inc. such that any individuality and separateness between and among the Individual Defendants, on the one hand, and HQ Inc., on the other hand, have ceased and HQ Inc. is the alter ego of the Individual Defendants:

a.      At all relevant times, Merryman and Clé owned and controlled HQ Inc.'s business and accounts, despite ostensibly placing ownership of HQ Inc. in Merryman's name alone.

b.      Notwithstanding the façade of placing ownership of HQ Inc. in Merryman's sole name, Clé regularly communicated with APPS on behalf of HQ Inc., negotiated on behalf of HQ Inc., and demanded payments on behalf of HQ Inc.  APPS is informed and believes that HQ Inc. was formed with money from Clé and that he controlled the company and received money from HQ Inc.'s accounts.

c.      At all relevant times, HQ Inc. was used by the Individual Defendants as a device to operate the credit card processing scheme described below and avoid individual liability.

d.      APPS is informed and believes and, based thereon, alleges that: the Individual Defendants have completely controlled, dominated, managed, and operated HQ Inc. for their own benefit and gain; the Individual Defendants took substantial monies from the accounts of HQ Inc., essentially treating HQ Inc.'s accounts as their own, and siphoning the money out of the company rendering the company unable to fulfill its obligations to its customers.

e.      The Individual Defendants have intermingled HQ Inc.'s assets with their individual assets to suit their own convenience.

f.      HQ Inc. was inadequately capitalized and, as detailed below, operated akin to a pyramid scheme.

g.      The Individual Defendants used HQ Inc. as a sham to defraud the consumers, credit card processors, acquirers such as APPS, banks and the regulatory authorities.  As such, injustice would result if the fiction of separateness is maintained.

COMPLAINT

## COMMON ENTERPRISE

7.     In doing the acts alleged herein, Defendants engaged in a sophisticated conspiracy to defraud consumers, credit card processors, acquirers and banks as detailed in paragraphs 75 through 85 herein below.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this matter under 28 U.S.C. Section 1332(a)(l) on the basis of diversity of citizenship, because the amount in controversy exceeds $75,000.00, the parties are citizens of different states, and there is an actual controversy between the parties.

9.     This Court also has federal question jurisdiction over this matter under 28 U.S.C.A. § 1331 because the Complaint states a cause of action for violation of the Racketeer Influenced and Corrupt Organizations Act under 18 U.S.C. § 1962(c) and the ends of justice require that the case against all Defendants be tried in this forum.

   a.     The Defendants have minimum contacts with the United States;

   b.     This Court has personal jurisdiction over Merryman and Clé as residents of Pleasanton, California; and

   c.     No single district would be able to exercise personal jurisdiction over both HQ Inc. (a Delaware corporation) and the remaining Defendants who are all California residents.

10.     Venue in the Northern District of California is proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the District, the claims alleged arise out of Defendants' contacts with this district, and hundreds of California residents were victimized by Defendants' conduct as alleged herein.

///

///

# FACTUAL BACKGROUND

*APPS Business:*

11.     For over a decade, APPS has provided credit card processing services to merchants who desire to accept credit card payments.  APPS is a respected industry leader providing payment processing for commercial merchants and governmental entities throughout the United States.  APPS's customers include county and city governments, as well as nationwide merchants in the transportation, lodging, retail, healthcare and numerous other industries.

12.     APPS, along with its depositing bank, is known in the payment card industry as an "acquirer."  As an acquirer, APPS acts as an intermediary between merchants who desire to accept credit card payments and the banks that issue credit cards to consumers, such as Visa and MasterCard.

13.     APPS essentially "settles" the money flowing between the various parties to a typical credit card transaction.  As an acquirer, APPS typically enters into an agreement with a merchant to provide the merchant with, in essence, a line of credit.  Under the agreement with the merchant, APPS exchanges funds with the credit card issuing banks on behalf of the merchant, and then pays the merchant for its daily payment-card activity minus any reversals, interchange fees, and acquirer fees.  Thus, acquirers such as APPS are basically guarantors of the merchant's credit card transactions, taking on the risk of any chargebacks and related fees that may be assessed by the issuing banks for the merchants' customers should they dispute the charges or demand refunds. Notably, chargebacks can be assessed more than 12 months after the transaction takes place depending on the reason for the dispute.

14.     Acquirers manage these risks by requiring that a portion of the processing funds due to the merchants be deposited into a reserve account for a period of time before releasing the funds to the merchants.  The calculation of the reserve amount and length of the reserve hold is determined by the nature of the merchant's business; whether they are "low risk" or "high risk" merchants.

15.     The credit card brands as a whole classify merchants as "low risk" where at least 70% of the card transactions come from consumers that appear in person at the merchant's business with their card in hand, such as brick and mortar stores and restaurants.  The credit card brands generally classify all other merchants as "high risk" merchants.  This especially includes merchants who sell their products and services online because the merchant's inability to inspect the physical credit cards and the nature of the business (taking payment for future deliveries/services) substantially increases the risk of fraudulent transactions.

***HotelQuickly's Business:***

16.     Founded in 2012, HotelQuickly is an Asian-based hotel booking website with accompanying mobile app for Android and iOS.  It claimed to offer access to almost half a million hotels and offer services in 17 languages.

17.     HotelQuickly's customers paid HotelQuickly for their reservations at the time the reservation was made, often for hotel stays that would not happen for several months in the future.

18.     In August 2017, Rising Sun Merchant Services Pte Ltd, a Singapore registered company ("Rising Sun Ltd."), purchased HotelQuickly.  Clé was the sole company director of Rising Sun Ltd.  After it purchased HotelQuickly, Clé also became the sole company director of HotelQuickly.

19.     Shortly after the purchase, HotelQuickly expanded into the US market under the business entity HQ Inc.  Although Merryman was listed on the corporate documents as the sole owner of HQ Inc., Clé was intimately involved in the operations and finances of the US version of the company, often communicating with APPS as the owner.

20.     Merryman was, and is, business partners with Clé in a private investment firm known as Rising Sun Ventures, LLC.  Clé is the Chairman and Merryman is the Vice-Chairman of Rising Sun Ventures, LLC.

///

*HQ Inc. Contracts with APPS for Domestic Credit Card Processing:*

21.     In November 2017, Merryman contacted APPS with a referral to HQ Inc.  Because HQ Inc. provided its services online and received its customers' credit card information through its website (also known as an eCommerce business), and based on its business model of accepting payment for future services, it was a paradigm "high risk" merchant.

22.     On November 14, 2017, HQ Inc. and APPS entered into a written Merchant Application and Agreement (the "Agreement"). As part of the Agreement, APPS would provide credit card processing services for HQ. Inc. for a term of three years.  In exchange APPS would receive specified fees for its services, residuals and ancillary fees.

23.     HQ Inc. and Merryman both executed the Agreement.  By signing the Agreement, HQ Inc. and Merryman certified that they reviewed and agreed to be bound by all of its terms and conditions, including the guarantee.

24.     The terms and conditions of the Agreement expressly limited the "chargebacks" HQ Inc. could incur. A chargeback is a credit card transaction that is disputed by the cardholder, typically because the merchant failed to perform the service or deliver the goods as promised.  APPS had discretion to terminate the Agreement if: "At any time during the term of this Agreement, Merchant has had a monthly ratio of Chargebacks to Charges exceeding one percent (1%), or Chargebacks are in excess of three percent (3%) of any monthly dollar amount of Charges."  APPS was also free to terminate the Agreement if HQ Inc. failed to comply with the guidelines established by the Card Brands (such as Visa and MasterCard) or if the Card Brands notified APPS of suspicious transactions.

25.     Under the Agreement, each chargeback to HQ Inc. is immediately due and payable.  In addition, in the event of an early termination of the Agreement, the parties agreed that APPS could charge an early termination fee ("ETF").  The ETF is calculated as the number of months remaining on the Agreement multiplied by the

1  average monthly processing fees over the most recent six (6) months and adding

2  costs and attorneys' fees.

3      26.    Merryman executed the Agreement with knowledge of the foregoing

4  provisions and with an understanding as an industry veteran of the consequences of

5  the foregoing provisions.

6      27.    Merryman also personally guaranteed HQ Inc.'s performance of all

7  terms and conditions of the Agreement, including the payment of the ETF.

8      28.    After it executed the Agreement, HQ Inc. began processing credit card

9  transactions with APPS on December 26, 2017.

10      ***HQ Inc.'s Early Termination of the Agreement:***

11      29.    After processing with APPS for only a week, HQ Inc.'s account was

12  "flagged" by APPS's Risk Department due to an excessive number of instances

13  where cardholders declined the charges.  The following month, in February 2018,

14  APPS began receiving notifications from Visa that HQ Inc.'s chargeback-to-sale

15  ratios exceeded the Card Brands' thresholds.

16      30.    APPS warned HQ Inc. several times that its chargeback ratios were

17  excessive and that HQ Inc. had entered Visa's chargeback monitoring program.

18  Over the next several months, APPS offered several options to HQ Inc. to assist in

19  controlling the excessive chargeback issues and lowering its chargeback ratios.

20      31.    On at least six occasions between February and July 2018, Merryman

21  repeatedly represented to APPS that HQ Inc. was implementing remedial measures

22  – including adding fraud prevention software and hiring additional staff – designed

23  to reduce HQ Inc.'s chargebacks and assist with identifying fraudulent activity.

24  Specific representations included the following:

25          a.    On or about April 20, 2018, Defendants expressly represented to

26      APPS and Visa that "HotelQuickly has hired additional 20 customer support

27      agents."

28

8

COMPLAINT

b.      On or about June 20, 2018, Defendants expressly represented to APPS and Visa that they implemented a fraud management system.

c.      On or about June 20, 2018, Defendants expressly represented to APPS and Visa that they were implementing a chargeback reduction program known as 3DS to reduce chargebacks.

32.     Contrary to Defendants' promises, none of the chargeback reduction methods were ever implemented by HQ Inc. and APPS's suggestions were ignored.

33.     In July and August 2018, HQ Inc.'s chargeback ratios hit and later exceeded 2.40% and the company was in its 6th month on Visa's chargeback monitoring program.  As a result, on August 30, 2018, APPS was forced to terminate the Agreement, effective immediately.

34.     In response, Clé instructed Merryman to block all debits from APPS so that APPS could no longer satisfy chargebacks from HQ Inc.'s bank account. Merryman did as instructed.

35.     By the time HQ Inc. was terminated in August 2018, it had processed approximately 85,400 transactions, issued approximately $3,900,000 in refunds, and had more than $500,000 in cardholder disputes outstanding.  Because HQ Inc. failed to immediately pay the chargebacks from its checking account as was required under the Agreement, and because APPS was no longer authorized to debit HQ Inc.'s bank account, APPS was forced to use money from HQ Inc.'s reserve account to reimburse the disgruntled consumers and pay the related fees associated with the chargebacks.

36.     As set forth above, the reserve account was in place to compensate APPS for monies it was required to expend and to collect the ETF, not to pay chargebacks that should have been debited from HQ Inc.'s bank account.

37.     To date, APPS has paid more than $200,000 in refunds and $400,000 in chargebacks out of HQ Inc.'s reserve account and the chargebacks continue to come in.  Given HQ Inc.'s overall processing volume of more than $24,316,000, APPS

9

COMPLAINT

1  expects the chargebacks to continue.  Due to the significant volume of chargebacks

2  that have and continue to come in, HQ Inc.'s reserve account is now depleted of

3  funds, yet APPS remains responsible for reimbursing the defrauded consumers and

4  paying the associated fees imposed by the banks and Card Brands, and APPS has no

5  available funds left in the reserve account to satisfy the ETF.

6      38.     Notably, despite Merryman being listed as the sole owner and officer of

7  HQ Inc., Clé regularly communicated with APPS regarding HQ Inc.'s processing

8  and chargebacks and the amounts in the reserve and merchant accounts, including

9  making demands for the release of processing funds.  Clé also controlled the access

10  to HQ Inc.'s bank account as referenced above.

11  ***HotelQuickly and HQ Inc. Scam to Defraud Consumers:***

12      39.     APPS is informed and believes and on that basis alleges that HQ Inc.'s

13  excessive chargebacks arose because HotelQuickly and HQ Inc.'s business turned

14  out to be a scam set up to defraud consumers, credit card processors, acquirers such

15  as APPS, banks and the regulatory authorities.

16      40.     In December 2018 – at the height of the holiday travel season –

17  thousands of HotelQuickly and HQ Inc. customers were advised that their hotel

18  bookings had been cancelled:



COMPLAINT



41.    In response to the customers' demands for a refund, HotelQuickly and HQ Inc. responded:

"In reference to your refund request, unfortunately, at this time and due to an issue with our system, we are unable to process the refund directly to your card.

"However, we have successfully processed a full refund in the form of a voucher for later use. The refund voucher will be available for you to use any new booking and the voucher can be extended at any time.

"This is the only refund method we have available at the moment."

42.     The vouchers later proved to be worthless.  When customers attempted to use the vouchers, they were advised either that there were no available hotels or that the voucher had already been used.  Some customers clicked on the link to access the vouchers to find that the link was disabled.



43.     But not all customers had the benefit of advance notice of the cancellation/lack of reservation.  Many customers actually arrived at their hotels to discover that there were no reservations made for them, that the hotel had never heard of HotelQuickly or HQ Inc., and that, if the hotel did happen to have a vacancy (which was often not the case), the customer would be required to pay for a room again – at a much higher rate.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



22      44.     Many customers who sought recourse from HotelQuickly or HQ Inc.

23  learned that HotelQuickly's travel confirmation email was fake and often included a

24  phony phone number to contact them directly and a phony phone number to contact

25  the hotel:

26

27  ///

28  ///



**120. Re: HotelQuickly**
Feb 24, 2018, 10:27 AM

🔖 Save

They take your money and give you a booking confirmation for you only to find out that you actually don't have a booking. run, run very fast, away from them!!!!!!!!!!!!!!!!!!!!!

Level 1 Contributor



**78. Re: HotelQuickly**
Oct 6, 2017, 11:21 PM

🔖 Save

I, too, have made the mistake of assuming that because TripAdvisor had them listed at a price much lower than the others, that they are a good site to book through. I will find out soon. I booked a room yesterday at a hotel for $100 less than all of the other TA quotes. The first strike was that they only gave me a booking ID after pre-paying-not an actual confirmation number to use at check-in, nor even what type of room was booked. Second strike- I called the hotel the next evening after booking and not only do they have no record of my reservation, but they have no knowledge of HotelQuickly nor is it listed an one of their third-party bookers. I contacted HQ via chat immediately after hearing this from the hotel, and the agent stated that there must be a mistake that will be updated. The agent assured me that this would be taken care of before the deadline to cancel the room. They've got one more strike with me before I report the charge as fraudulent to my credit card company. To be safe, I'd recommend following up with the hotel after using HQ to make sure that they actually have a room reserved in your name, and if not, go ahead and reserve one that you can cancel while waiting for HQ.

7 posts
2 reviews
25 helpful votes



**HotelQuickly Fraud**
Jan 10, 2018, 12:12 AM

🔖 Save

I just wanted to share my horrible experience with HotelQuickly which was an agency Tripadvisor sponsored as showing a room available. I booked my room through Tripadvisor, which then redirected to me to Hotelquickly to book. I booked my room on Sunday, January 7th. I was skeptical as I tried to book directly with the hotel and they said they were full. I continued to follow up on Monday, and they advised it takes 24 hours. I called hotel again and they confirmed that Hotelquickly reached out to them attempting to book a room, however they were full as I already knew and rejected their request. Totally unacceptable as this wasted days and ended up costing me more money to find a new hotel room. I am traveling with a 3 year old and 5 year old an it would have been terrible to find out we did not have a room. I only discovered this based on my continued follow up with the hotel directly. Hotelquickly's travel confirmation email has a FAKE phone number to contact them direct and a FAKE phone number to contact the hotel even! It's very concerning that Tripadvisor would allow a company such as Hotelquickly to falsely advertise rooms available on their website. This has certainly diminished my trust in booking rooms through Tripadvisor. I now have to deal with disputing the charge with my credit card company along with Hotelquickly. Both of which is additional wasted time AND having to find a a hotel room during high season in my destination town.

Level 2 Contributor

4 posts
4 reviews
1 helpful vote

45.     APPS later learned that HotelQuickly and HQ Inc. was operated similar to a pyramid scheme, with the companies taking money from new bookings to pay for the older bookings, until the entire house of cards collapsed in December 2018 when they could not afford to pay for the many holiday bookings they took (and were already paid for by customers) many months prior.  Consistent with this structure, Defendants: took bookings from customers for future hotel room stays; accepted payments at the time the bookings were made; either failed to make the reservation at all or, alternatively, cancelled the reservation shortly prior to the customer's arrival date; refused to issue a refund to the aggrieved customer; failed to

14

1    respond to customer complaints or delayed the customers with false promises of

2    credits for future bookings; and later forced, even encouraged, customers to dispute

3    their credit card charges, resulting in the acquirers – such as APPS and its successor

4    acquirers – bearing the ultimate financial loss on the transactions:



(HotelQuickly Ltd.)
Dec 28, 04:21 +07

Dear ▮▮▮▮

If you don't want to accept a refund in the form of a voucher, you may be able to apply for a charge back with your credit card issuer to get your funds back.

We are very sorry for the inconvenience caused.

Yours sincerely,

Customer Success Team

Email: support@hotelquickly.com
Get instant help by visiting our Frequently Asked Questions here > FAQ https://support.hotelquickly.com/hc/en-us

Discover best promotion with us at https://direct.hotelquickly.com/
Inside deal with best promotion :
https://app.hotelquickly.com/get-app

46.     The foregoing illegal activity was in violation of the Agreement, constituted fraud and deceit, and violated numerous statutory prohibitions.  This illegal activity damaged APPS to the extent it was, and continues to be, required to pay out significant sums of money to satisfy the defrauded customers who paid for bookings between December 26, 2017 and August 30, 2018 and later charged back their transactions.

47.     After HQ Inc.'s reserve funds were depleted, APPS was left with no recourse for the chargebacks that continued to flow in and was forced to reimburse consumers from its own funds.  As of the date of this Complaint, chargebacks continue to accrue and HQ Inc.'s reserve account is depleted.

48.     Moreover, because APPS remains liable directly to the consumer for all discrepancies on the credit card transactions it has processed between December 26, 2017 and August 30, 2018, APPS now seeks a judgment ordering the Defendants to indemnify APPS from any and all future claims from consumers and regulatory agencies arising out of the more than $24,316,000 in processed transactions.

///

///

## FIRST CAUSE OF ACTION

### (Breach of Contract against All Defendants)

49.     Plaintiff refers and incorporates by reference the allegations of paragraph 1 through 48 as though set forth fully herein.

50.     On or about November 14, 2017, HQ Inc. and APPS entered into the Agreement.  As part of the Agreement, APPS was to provide credit card processing services for HQ Inc. for an agreed-upon term of 3 years.

51.     Under the Agreement, HQ Inc. expressly agreed (among other things):

a.      To conduct its business in an appropriate manner by following the Card Brand's operating rules and all laws pertaining to the credit card processing industry;

b.      To perform all of its obligations to the cardholders in connection with the transaction;

c.      To submit only valid charges to APPS, and only after performing all of its services; and

d.      To immediately credit consumers or reimburse APPS for each chargeback.

52.     HQ Inc. also expressly agreed to pay the ETF if the Agreement was terminated "for cause" prior to the expiration of the 3 year term.

53.     HQ Inc. agreed that the Agreement could be terminated "for cause" if: "Merchant has violated any provision of this Agreement …; At any time during the term of this Agreement, Merchant has had a monthly ratio of Chargebacks to total transactions exceeding Card Association requirements or 1%, or Chargebacks exceed 3% of any monthly dollar amount of total transactions; … [and] Merchant or any of Merchant's principals, owners, officers, directors, agents, or employees has been involved in processing transactions arising from fraudulent, dishonest or otherwise unauthorized transactions …"

///

54.    HQ Inc. violated and breached the terms of the Agreement in each of the following respects:

a.    By allowing HQ Inc.'s chargebacks to substantially exceed those allowed under the Card Association requirements and the Agreement;

b.    By fraudulently charging consumer credit cards for bookings that they did not ever make with the hotels;

c.    By fraudulently charging consumer credit cards for bookings that they initially made with the hotels but later cancelled prior to the customer's arrival date;

d.    By refusing to refund their customers and instead issuing worthless credit vouchers;

e.    By disabling APPS's access to HQ Inc.'s bank account to reimburse disgruntled consumers;

f.    By encouraging disgruntled customers to charge back the transaction with their credit card issuing banks, ultimately forcing APPS to bear the losses on the transactions; and

g.    By failing and refusing to immediately reimburse APPS for all chargebacks and associated fees.

55.    As a result of the unacceptably high rate of chargebacks, APPS terminated the Agreement effective August 30, 2018.  The remaining breaches described above were only discovered after the termination of the Agreement as the chargebacks began to flow in from consumers at an alarming rate, particularly during and after the 2018 holiday season.  In December 2018 alone, HQ Inc. had approximately $130,000 in chargebacks and more than $34,000 in credits were issued.

56.    APPS performed all of its obligations required under the Agreement, except those obligations that were excused by HQ Inc.'s breach of the Agreement.
///

57.     Pursuant to the terms of the Agreement, APPS was entitled to charge HQ Inc. an ETF in the amount of $953,361.18 for its violations and early termination of the Agreement.  To date HQ Inc. has failed and refused to pay the ETF and there are insufficient funds in the reserve account to satisfy the ETF.

58.     APPS exhausted the funds in HQ Inc.'s reserve account and chargebacks continue to occur.  As additional chargebacks are processed beyond the funds in the reserve account, APPS is responsible to reimburse those consumers out of its own funds.  Because many customers have not yet attempted to redeem the worthless vouchers issued, it is difficult to predict the amount of future chargebacks and related fees that APPS will be responsible for.

59.     Thus, as a direct and proximate result of HQ Inc.'s breach of the Agreement, APPS has suffered damages of $953,361.18 in addition to any continuing damages arising from unreimbursed chargebacks.  Moreover, as the alter egos of HQ Inc., Merryman and Clé are responsible for these damages.

60.     The Agreement expressly provides for the recovery of attorneys' fees and costs in any action brought to recover money from Defendants for their failure to pay money due.  It has been necessary for APPS to retain legal counsel to prosecute this action.  Pursuant to the Agreement, APPS is entitled to recover its attorney's fees and costs reasonably incurred in prosecuting this action.

## SECOND CAUSE OF ACTION

### (Breach of Guaranty against Merryman)

61.     Plaintiff refers and incorporates by reference the allegations of paragraph 1 through 60 as though set forth fully herein.

62.     On or about April 9, 2014, Merryman personally guaranteed the obligations of HQ Inc. under the Agreement, including payment of the ETF.

63.     Merryman breached his guaranty by failing to pay the ETF and immediately reimburse HQ Inc.'s customers for chargebacks and pay the banks and Card Brands the associated fees.

COMPLAINT

1      64.     As a direct and proximate result of Merryman's breach of the

2  Agreement, APPS has suffered damages of $953,361.18 in addition to any

3  continuing damages arising from unreimbursed chargebacks.

4      65.     The Agreement expressly provides for the recovery of attorneys' fees

5  and costs in any action arising out of Merryman's guaranty.  It has been necessary

6  for APPS to retain legal counsel to prosecute this action.  Pursuant to the

7  Agreement, APPS is entitled to recover its attorney's fees and costs reasonably

8  incurred in prosecuting this action.

9                          **THIRD CAUSE OF ACTION**

10                 **(Fraud in the Inducement as against Merryman)**

11     66.     Plaintiff refers and incorporates by reference the allegations of

12  paragraph 1 through 65 as though set forth fully herein.

13     67.     On November 14, 2017, Merryman expressly represented to APPS in

14  the Agreement that HQ Inc. did not charge its customers prior to the customers'

15  receipt of the services provided.

16     68.     On November 14, 2017, Merryman expressly represented to APPS in

17  the Agreement that HQ Inc. provided a "30 day refund policy" for its customers.

18     69.     In reliance on the foregoing representations, APPS agreed to enter into

19  the Agreement and process credit card transactions for HQ Inc.  The foregoing

20  representations were critical to APPS's decision to process transactions for HQ Inc.

21  because if HQ Inc. actually charged its customers at the time the service was

22  provided and honored refunds for its dissatisfied customers as represented, HQ Inc.

23  could not have used funds from later bookings to finance the earlier bookings and

24  run the company like a pyramid scheme.

25     70.     The foregoing representations were false and known by Merryman to

26  be false at the time they were made.  In reality, HQ Inc. charged its customers

27  immediately for services to be provided in the future and failed to honor refund

28  ///

1  requests, instead issuing worthless vouchers. APPS would have never processed

2  transactions for HQ Inc. had it known its true business model.

3      71.      As a direct and proximate result of Merryman's false representations,

4  APPS was damaged in an amount to be determined at the time of trial, but not less

5  than $500,000.

6      72.      In engaging in the acts alleged herein above, Merryman acted with

7  oppression, fraud and/or malice, express or implied, and with the specific intent to

8  injure APPS, justifying an award of exemplary and punitive damages.

9                    **FOURTH CAUSE OF ACTION**

10      **(Violation of 18 U.S.C. § 1962(c) [Racketeer Influenced and Corrupt**

11              **Organizations Act] against all Defendants)**

12      73.      Plaintiff refers and incorporates by reference the allegations of

13  paragraph 1 through 72 as though set forth fully herein.

14      74.      The Racketeer Influenced and Corrupt Organizations Act in 18 U.S.C.

15  § 1962(c) ("RICO") makes it unlawful for "any person employed by or associated

16  with any enterprise engaged in, or the activities of which affect, interstate or foreign

17  commerce, to conduct or participate, directly or indirectly, in the conduct of such

18  enterprise's affairs through a pattern of racketeering activity ...." APPS is informed

19  and believes and on that basis alleges that Defendants violated the RICO statute in

20  the following respects:

21      ***The Scheme to Defraud Consumers:***

22      75.      From at least November 2017 through the present, Defendants engaged

23  in a pattern of racketeering activity by committing unfair or deceptive acts toward

24  consumers in violation of 18 U.S.C. § 1029, 18 U.S.C. § 1343 and 18 U.S.C. § 1344

25  as well as the laws of the State of California, including Business and Professions

26  Code, Sections 17200, among other statutes and regulations, by: deceptively luring

27  consumers into making hotel reservations through their website; accepting credit

28  card payments for the reservations; either not booking the hotels or cancelling the

1  bookings prior to the customer's arrival; failing and refusing to refund the
2  customers; issuing worthless vouchers to the customers for future bookings; and
3  failing to pay the chargebacks and related fees assessed when the customers
4  disputed the charges with their credit card issuers.

5      76.    In doing so, Defendants received for themselves more than
6  $20,000,000 in fraudulent gains through the credit cards processed APPS between
7  December 2017 and August 2018 alone, and continuing thereafter through other
8  credit card processors.

9  ***Use of Interstate Wire Transmissions to Facilitate the Scheme:***

10     77.    In engaging in foregoing scheme, Defendants used the predicate act of
11 wire fraud, unlawful under 18 U.S.C. § 1343, in at least the following respects:

12         a.    In furtherance of the fraudulent scheme, Defendants used false
13 and misleading advertisements on their websites to advertise their fraudulent
14 hotel booking services;

15         b.    In furtherance of the scheme, Defendants used emails and the
16 internet to disseminate fraudulent booking confirmations to consumers;

17         c.    In furtherance of the scheme, Defendants used emails to
18 fraudulently induce APPS and HQ Inc.'s other credit card processors to
19 process HQ Inc.'s fraudulent credit card transactions;

20         d.    In furtherance of the scheme, Defendants used emails to defraud
21 consumers who complained about the cancelled and non-existent bookings by
22 promising vouchers which were worthless or which HQ Inc. failed to deliver.

23     78.    In undertaking these predicate acts of wire fraud, Defendants defrauded
24 consumers, credit card processors and acquirers (including APPS), banks and the
25 Card Brands.

26 ***Defendants' Respective Roles in the Scheme:***

27     79.    **HQ Inc.:**  HQ Inc. is the processing "merchant."  As detailed above, it:
28 falsely advertised its services; lured unsuspecting consumers into providing their

credit card information and personally identifying information with the promise of discounted hotel bookings; provided "confirmations" to consumers containing false information regarding the booking and hotel contact information; after receiving the consumer payments, either failed to make the promised bookings or made the bookings and cancelled them prior to the customer's check-in date; refused to refund the aggrieved customers' money; issued fraudulent, invalid credit vouchers to complaining customers; and encouraged customers to initiate chargebacks with their issuing banks so that APPS and subsequent acquirers would be forced to reimburse the customers.

80.  **Merryman:**  Merryman is listed in HQ Inc.'s organizational documents as its sole owner and officer.  Merryman deceived APPS and other acquirers to provide processing services for HQ Inc. as set forth above.  Merryman signed all documents on HQ Inc.'s behalf, including the Agreement and associated Guarantee.  APPS is informed and believes that, in reality, HQ Inc. was owned and controlled by Merryman along with his business partner Clé, the owner and sole company director of HotelQuickly (the Asian version of the company).  Merryman participated in the operation and management of HQ Inc. and directed the affairs of the company.  APPS is informed and believes that Merryman and the other companies he controls received substantial funds from HQ Inc.'s fraudulent processing.

81.  **Clé:**  Clé is the owner and sole company director of HotelQuickly.  He also co-owns of Rising Sun Ventures with Merryman.  APPS is informed and believes and, based thereon, alleges that Clé financed HQ Inc. and, along with Merryman, controlled the company.  Clé participated in the operation and management of HQ Inc. and directed the affairs of the company.  Clé regularly communicated with APPS relating to HQ Inc.'s credit card processing services and accounts, negotiating fees and demanding the return of funds on behalf of HQ Inc.

///

APPS is informed and believes that Clé and the other companies he controls received substantial funds from HQ Inc.'s fraudulent processing.

### Allegations Common to All Defendants:

82.     Through their conduct, Defendants formed an enterprise associated for a common purpose of engaging in the specific course of conduct to mislead consumers and to obtain and process fraudulent credit card transactions for the express purpose of receiving money from such unlawful credit card transactions without actually providing the promised goods and services.  Defendants engaged in this particular fraudulent course of conduct and worked together to achieve their goal of receiving money from the unwary consumers through the fraudulent credit card transactions.  APPS is informed and believes, and on that basis alleges, that each of the Individual Defendants participated in the operation or management of the enterprise and that each Defendant had some part in directing the affairs of the enterprise.  Defendants participated in the scheme with the specific intent to defraud consumers, credit card processors and acquirers such as APPS, banks and the Card Brands.

83.     This pattern of racketeering activity engaged in by Defendants transcended their credit card processing with APPS.  APPS is informed and believes and, based thereon, alleges that Defendants engaged in these same predicate acts with other credit card processors, acquirers and banks, both before and after their relationship with APPS.  APPS is informed and believes, and based thereon alleges, that Defendants are currently engaging in the same scheme through two new business enterprises, eOasia and Travelbook.  Accordingly, Defendants' activities amount to or pose a threat of continued criminal activity extending indefinitely into the future.

84.     As a direct and proximate result of Defendants' violations of RICO, APPS was injured when it was forced to pay out more than $500,000 in chargebacks

///

1   to compensate defrauded consumers.  And the chargebacks from HQ Inc.'s

2   processing through APPS continue to flow in.

3       85.     Pursuant to 18 U.S.C. § 1964(c) APPS seeks an award of damages

4   against the Defendants, for threefold the damages it has sustained in the sum of at

5   least $1,500,000 in addition to it costs of suit, including reasonable attorneys' fees.

6                        **FIFTH CAUSE OF ACTION**

7       **(Contractual Indemnification against Merryman and HQ Inc.)**

8       86.     Plaintiff refers and incorporates by reference the allegations of

9   paragraph 1 through 85 as though set forth fully herein.

10      87.     The Agreement provides, in relevant part:

11              Merchant agrees to indemnify [APPS], including their
                officers, directors, employees, and agents against and to
12              hold them harmless from any and all claims and demands
                of any party arising from or based upon any act or
13              omission of Merchant, Merchant's employees, Merchant's
                designated representatives or agents, or Merchant's
14              Merchant Servicers in connection with or arising out of
                this Agreement, the duties to be performed by Merchant
15              pursuant to this Agreement, any Charges which Merchant
                submits to [APPS], or Merchant's violation of the
16              Operating Rules or any applicable law.

17      88.     As alleged above, APPS has been damaged by Defendants' actions and

18  omissions which, to date, have resulted monies expended by APPS in satisfaction of

19  the claims of HQ Inc.'s customers and additional fees, fines and penalties assessed

20  by the Card Brands.

21      89.     APPS has previously demanded, and by this action expressly demands,

22  that Defendants defend and indemnify APPS from and against such claims and

23  losses, as to which APPS denies any liability.  Because Defendants have failed and

24  refused to defend and indemnify APPS from and against such claims and alleged

25  losses, Defendants have breached their obligations under the Agreement.

26      90.     APPS performed all of its obligations required under the Agreement,

27  except those obligations that were excused by law or Defendants' breach.

28  ///

91.     As a direct and proximate result of Defendants' breach of the Agreement, APPS has been damaged and will hereafter suffer damages for which Defendants are responsible.  Defendants are further liable, obligated and required to defend, indemnify and hold APPS harmless as and against any and all amounts that APPS, as the acquirer, may in the future be required to pay by way of costs, claims, judgment or compromise together with any and all attorneys' fees and costs incurred in addressing or defending against the claims of HQ Inc.'s customers, the Card Brands and regulatory agencies.

92.     The Agreement expressly provides for the recovery of attorneys' fees and costs in any action arising out of HQ Inc.'s processing under the Agreement.  It has been necessary for APPS to retain legal counsel to prosecute this action. Pursuant to the Agreement, APPS is entitled to recover its attorney's fees and costs reasonably incurred herein.

## SIXTH CAUSE OF ACTION

### (Equitable Indemnification against all Defendants)

93.     Plaintiff refers and incorporates by reference the allegations of paragraph 1 through 92 as though set forth fully herein.

94.     APPS is informed and believes that if damages and injuries were sustained as the result of Defendants' actions in defrauding consumers by: charging consumer credit cards for bookings that they did not make with the hotels; fraudulently charging consumer credit cards for bookings that they actually made with the hotels, but later cancelled prior to the customers' arrival dates; refusing to refund the customers for the non-existent and cancelled bookings and instead issuing worthless credit vouchers, which damages and injuries APPS denies were attributable to it, such damages and injuries were actively, primarily and directly caused and proximately contributed to at least in part by the conduct, actions, inaction, omissions, and other wrongdoings of the Defendants, and each of them. ///

95.     The Defendants, and each of them, owed a duty of care to APPS to ensure that its credit card processing: was lawful; was not injurious to cardholders, the banks and the Card Brands; was in compliance with HQ Inc.'s obligations under the Agreement; and was in compliance with the laws of the United States, including 18 U.S.C. § 1029, 18 U.S.C. § 1343 and 18 U.S.C. § 1344 as well as the laws of the State of California, including Business and Professions Code, Sections 17200.

96.     The Defendants, and each of them, breached duties owing directly or indirectly to APPS; and any liability for such damages or injuries arise, if at all, not as the result of any conduct, actions, inaction, omissions, or wrongdoing on APPS's part but only by reason of the wrongdoing of the Defendants, and each of them.

97.     By virtue of such conduct, actions, inaction, omissions, or other wrongdoing of Defendants, and their breaches of duties owing directly or indirectly to APPS committed thereby, Defendants are liable, obligated and required to the extent of their respective liability as determined by the trier of fact, to defend, indemnify and hold APPS harmless as and against any and all amounts that APPS, as the acquirer, may in the future be required to pay by way of costs, claims, judgment or compromise together with any and all attorneys' fees and costs incurred in addressing or defending against the claims of HQ Inc.'s customers.  APPS is thus entitled to equitable indemnification by all of the Defendants.

## PRAYER FOR RELIEF

WHEREFORE, APPS prays for judgment on its Complaint as follows:

1.     For general damages of $953,361.18 in addition to any continuing damages arising from unreimbursed chargebacks;

2.     For an award pursuant to 18 U.S.C. § 1964(c) against HQ Inc., Merryman and Clé for their violation of the RICO statute of threefold the damages APPS has sustained in the sum of at least $1,500,000 in addition to cost of suit, including reasonable attorneys' fees.

///

3.      For a determination that Defendants are liable, obligated and required to the extent of their respective liability as determined by the trier of fact, to defend, indemnify and hold APPS harmless as and against any and all amounts that APPS, as the acquirer, has paid or may in the future be required to pay by way of costs, claims, judgment or compromise together with any and all attorneys' fees and costs incurred in addressing or defending against the claims of HQ Inc.'s customers and regulatory agencies.

4.      For an award of exemplary and punitive damages against HQ Inc. and Merryman in an amount to be determined at trial.

5.      For reasonable attorneys' fees and costs of suit incurred herein;

6.      For pre-judgment and post-judgment interest on the amount recovered at the highest legal rate from the earliest legal date; and

7.      For such other and further relief as the Court may deem just and proper.


DATED this 18th day of April, 2019

                              JULANDER, BROWN & BOLLARD


                              By      /s/ Dirk O. Julander
                                      DIRK O. JULANDER
                                      9110 Irvine Center Drive
                                      Irvine, California 92618
                                      Tel. (949) 477-2100

                                      *Attorneys for Plaintiff, Atlantic-Pacific
                                      Processing Systems, Inc.*

COMPLAINT